UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DCH LICENSING L.L.C., <br><br> Plaintiff, <br><br> -against- <br><br> JEFFREY RINDE, CKR LAW LLP, DAVID AULT, STRAIGHTLINE CAPITAL L. L. C., AULT CAPITAL. LLC, DONALD HIRSCH, EUWANA CAPITAL LLC, MONSTER CAPITAL CORP., and RICK SIEGEL, <br><br> Defendants. | Case No.: 20-cv-2898 <br><br><br> <u>**COMPLAINT**</u> <br><br><br> <u>Jury Trial Demanded</u> |

Plaintiff DCH LICENSING L.L.C., for its Complaint against Defendants JEFFREY RINDE, CKR LAW LLP, DAVID AULT, STRAIGHTLINE CAPITAL L. L. C., AULT CAPITAL. LLC, DONALD HIRSCH, EUWANA CAPITAL LLC, MONSTER CAPITAL CORP., and RICK SIEGEL, alleges as follows:

<u>**INTRODUCTION**</u>

1.      This action arises from repeated, ongoing, and organized fraud perpetrated by the Defendants against victims in New York, Michigan, Texas, Illinois, Massachusetts, Tennessee, Pennsylvania, Arizona, Minnesota, and Canada (and likely elsewhere).  At its heart, the fraud is a modern take on the classic "Nigerian Prince" scam – i.e., an advance fee scam.

2.      By and through a variety of corporate entities, Jeffrey Rinde, David Ault, Rick Siegel, and Donald Hirsch (collectively, the "RASH Defendants") conspired to, and executed a plan to, defraud victims out of hundreds of thousands of dollars at a time, with an aggregate loss to the victims in the millions, through fraudulent loan programs requiring an advance fee.  The RASH Defendants continue, to this day, to market the fraudulent loan programs in an attempt to entice more victims.

3.      On March 18, 2019, the FBI issued a warning, alert number "I-031819-PSA," advising the public of "Fraud actors scamming investors through fictitious standby letters of credit."  The warning contained the following information:

### SCAM COMMONALTIES:

- Offering returns or loans that are disproportionate to the risk involved
- Mimicking of legitimate financial instruments like SBLCs
- "Non-recourse" or "forgivable loans," where investors do not have to repay the loaned funds
- "Blocking of funds" or "proof of funds," typically with the use of a SWIFT MT 799 or MT 760
- Being asked to pay an advanced fee prior to funding or to initiate the loan or investment
- Transferring funds overseas or using foreign banks
- Improper references to legitimate financial institutions without their knowledge or consent
- Unnecessary secrecy or the signing of a non-disclosure agreement
- Intricate explanations and excuses as to why the promised funds or returns have failed to materialize
- The use of escrow accounts, including attorney escrow accounts
- The term "monetize"

While all of these elements may not appear in any one scam, it is common for several of them to occur. The defining characteristic, however, is the promise of a disproportionate return or loan without risk from a source, which is obscure or unable to be accurately verified.

4.      The instant matter, as detailed below, involves exactly this scam.  Prospective loan recipients were offered "loans" in million dollar amounts but were required to put hundreds of thousands of dollars in escrow to secure the loan.  In each case, the loan was never disbursed, and the escrow amount was never returned.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 1962 and 1964.

6.      Supplemental jurisdiction over the common law and State law claims alleged herein is available under 28 U.S.C. §1367(a) as they arise from the same core of operative facts

as those arising under 18 U.S.C. §§ 1962 and 1964 and are therefore properly brought before the Court.

7.      Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants, in particular CKR LAW and Rinde, reside, are found, have agents, and transacts their affairs within this district, and a substantial part of the events or omissions giving rise to the action occurred within this district.

## PARTIES

8.      Plaintiff DCH LICENSING L.L.C. (hereinafter "DCH") is a Limited Liability Company with its principal place of business in Sterling Heights, Michigan. DCH is involved in the cultivation of legal marijuana in Michigan.  DCH is comprised of three members: Daniel Hatmaker (Texas resident) (hereinafter "Hatmaker"), Nate Niehuus (Michigan resident) (hereinafter "Niehuus"), and Marissa Barlow (Massachusetts resident) (hereinafter "Barlow").

9.      Upon information and belief, Defendant JEFFREY RINDE (hereinafter "Rinde") is a resident of the State of Connecticut.

10.     Upon information and belief, Rinde is, and at all times relevant to this Complaint was, the Managing Partner of CKR Law LLP (hereinafter "CKR"), a limited liability partnership formed under the laws of California, with its principal place of business at 1330 Avenue of the Americas, 12th & 14th Floors, New York, New York 10019. CKR promotes itself as a global law firm operating through various separate and distinct legal entities.

11.     Upon information and belief, Defendant DAVID AULT (hereinafter "Ault") is a resident of the State of Florida.

12.     Upon information and belief, Ault is, and at all times relevant to this Complaint was, the owner and manager of STRAIGHTLINE L. L. C. (hereinafter "Straightline"), a Limited Liability Company with its principal place of business in North Oaks, Minnesota.  Straightline

purports to provide financing solutions for projects requiring $10M (ten million USD) to $1B (one billion USD) in funding.  Straightline's principal place of business is Ault's former marital residence.

13.     Upon information and belief, Ault is, and at all times relevant to this Complaint was, the owner and manager of AULT CAPITAL. LLC (hereinafter "Ault Capital"), a Limited Liability Company with its principal place of business in Estero, Florida.  Ault Capital's business appears to be a new iteration of Straightline, following the same "business" model.  Ault Capital's principal place of business is Ault's Florida residence.

14.     Upon information and belief, Defendant DONALD HIRSCH (hereinafter, "Hirsch") is a resident of the State of Illinois.

15.     Upon information and belief, Hirsch is, and at all times relevant to this Complaint was, the owner and manager of EUWANA CAPITAL LLC (hereinafter "Euwana"), a Limited Liability Company with its principal place of business in Hoffman Estates, Illinois.  Euwana purports to specialize in providing financing solutions for projects requiring at least $10M (ten million USD).

16.     Upon information and belief, Hirsch is, and at all times relevant to this Complaint was, the owner and manager of MONSTER CAPITAL CORP. (hereinafter "Monster"), a Corporation with its principal place of business in Hoffman Estates, Illinois.  Monster purports to specialize in providing financing solutions for projects requiring at least $10M (ten million USD), and appears to be simply a rebrand of Euwana. Both Euwana and Monster have the same business address of 146 W. Higgins Rd., Hoffman Estates, IL 60169 – an empty storefront in a strip mall:



17.     Upon information and belief, Defendant RICK SIEGEL (hereinafter "Siegel") is a resident of the State of Florida. Siegel is affiliated with Ault, Rinde, and Hirsch, assisted them in promoting the loan programs under the various corporate entities, and partook in the ill-gotten proceeds.  Siegel is the owner of affiliated "Straightline LLC", a Louisiana Limited Liability Company; however, it appears business was primarily conducted through the Minnesota Straightline.

## **FACTUAL ALLEGATIONS**

### As to Plaintiff DCH

18.     In early 2019, DCH was seeking financing in order to develop a legal marijuana cultivation facility, and for other corporate uses.

19.     The cannabis industry is an emerging industry rife with complex regulatory and legal issues; traditional lenders, such as banks, do not typically provide financing for such operations.

20.     Through a series of acquaintances, the principals of DCH were introduced to the RASH defendants.

21.     On January 28, 2019, DCH (specifically, Niehuus and Hatmaker) had a call with Hirsch/Euwana, who pitched the loan program.

22.     In February of 2019, Euwana provided an initial proposal to provide $10 million in financing to DCH and referred DCH to Ault/Straightline for execution.

23.     Also in February of 2019, Ault prepared a memorandum of understanding with DCH, and a proposal for $10 million in financing through Straightline.

24.     As part of both Euwana's and Straightline's sales pitch, both companies purport that "We work with a top New York law firm with international offices to hand our transactional requirements and closing process."

25.     In a recorded phone call DCH had with Ault and Hirsch on February 1, 2019, Ault assured DCH that he "was not doing anything innovative" with the loan, that he had closed "at least 50" similar loans, and that there was never an issue because their transactional attorney "never misses" and there is "never any problems with the money."

26.     In reality, the loan program has never disbursed any funds, to any client, since the RASH defendants began their scheme in 2014.

27.     Ault/Straightline claimed that the source of the funding was an "international oil and gas company."  Rinde/CKR later claimed the source of funding was a private investment group.  Rinde/CKR then later claimed the source of funding was a wealthy family in the Middle East, who he had previously represented, but he couldn't remember their names.

28.     As part of the loan program, Plaintiff was required to provide $400,000 (four hundred thousand USD) ("the Escrow") upfront, to be held in escrow until the $10 million loan was secured.

29.     Thereafter, Plaintiff was introduced to Rinde, Managing Partner of CKR Law, who prepared an Escrow Agreement executed March 22, 2019.

30.     As DCH was still hesitant regarding the authenticity of the program, on April 4, Rinde provided a written guarantee, on CKR letterhead, that in the event the initial tranche of loan funds were not provided within one hundred (100) days of the Escrow deposit, that Straightline would provide a full refund of the Escrow.  Notably, the correspondence states "It is understood that DCH Licensing (dba Fast Flower Farms) is relying upon these instructions as an inducement to enter into the Transaction with Straightline."

31.     On April 5, 2019, DCH provided the $400,000 Escrow *via* wire at the instruction of Rinde, purportedly to CKR Law's trust account at Citibank.

32.     As confirmed by Citibank to the undersigned, the account number used by Rinde and CKR to receive the April 5, 2019 wire was CKR Law's operating/checking account, not its trust account.

33.     On May 31, 2019, Rinde assured DCH that the process was moving forward as anticipated.

34.     On June 5, 2019, on a recorded call, Rinde informed DCH that he did not know where the loan money was, and that "this has never happened before."

35.     In reality, the RASH defendants have never been successful in securing loan funds through the program.

36.     On June 25, 2019, Rinde claimed "the Feds" had seized the money, and that he was going to have meetings in Washington, D.C. to try and release the loan funds.

37.     Rinde continued to claim that he as involved in meetings with "the Feds" throughout August of 2019.

38.     On September 24, 2019, Rinde claimed that DCH would receive the first tranche of the loan within 10 days.

39.     The loan having failed to be disbursed, and 100 days having lapsed since the Escrow was deposited, DCH requested return of the Escrow on October 7, 2019.

40.     On October 8, 2019, Rinde sent to DCH a copy of a SWIFT document, purporting to be a letter of credit ("LC") in the amount of $100 million.

41.     Rinde redacted several fields of the LC – specifically, the fields which would allow the legitimacy of the LC to be verified.

42.     On October 15, 2019, believing the LC to be legitimate, DCH cancelled the Escrow return request, expecting to receive the first tranche of the loan.

43.     On October 31, 2019, Ault/Straightline issued DCH correspondence indicating that Rinde was in the process of getting the funds cleared by government agencies, and that the process was expected to complete in early November 2019.

44.     On December 12, 2019, Rinde forwarded to DCH another LC with an extended date (the "extended LC").  This extended LC contained similar redactions to the original LC, which prevent verification.  Notably, the extended LC did identify the originating bank - Emirates NBD Bank PJSC, a Dubai government-owned bank.  It further identified that the purpose of the 100 million LC was for payment of "consulting fees".  Even if genuine, the extended LC appears to have been *designed* to raise AML and compliance red flags (and contingent on successfully misleading the banks on the purpose of funds).

45.     On December 27, 2019, Rinde told DCH on a recorded call that he had received a confirmation from a senior Wells Fargo executive that they received the extended LC.

46.     On January 13, 2020, Ault/Straightline informed DCH that his bank cannot confirm the LC.

47.     Also on January 13, 2020, on a recorded phone, Jim Hiller (non-party DCH affiliate) stated to Rinde that he has come to learn that Ault/Straightline has <u>never</u> successfully completed a loan under the program, and inquired as to whether the loan was salvageable or if DCH would receive their Escrow funds back.  Notably, <u>Rinde did not deny that Ault/Straightline had never successfully closed a loan under the program</u>.  Rinde stated that the refund procedure was "more complicated than the wording says" in the contract, but that it could be discussed.

48.     On the same call, Rinde claimed that, even if the transactions had gone through, the funds being transferred were not funds that had anything to do with DCH's loan.

49.      Rinde claimed there was a conference call between Ault/Straightline, the "senders rep[resentative]", and Wells Fargo for later that evening to sort out the issues with the transfer.

50.     On January 16, 2020, Rinde claimed that the call referenced on January 13, 2020 never occurred because a representative from the Middle East was unavailable.  Rinde admitted that himself and Ault/Straightline lack clarity or a timeline regarding completion of the LC transaction. Rinde then stated that there exist funds which were not a part of the LC transaction, which may be available through other sources in the Middle East to provide the loan.

51.     Also on January 16, 2020 Jim Hiller requested that Rinde e-mail a written explanation as to why the funds were unavailable and what steps were being taken to secure the loan. Rinde declined - unless Hiller agreed to mark the document Confidential and for Settlement Purposes only.

52.     Rinde admitted on the January 16, 2020 phone call that he had already released the Ecrow funds – which is in direct violation of the Escrow agreement between the parties.  Rinde contended that the conditions of release had been met.  Rinde claimed he would provide proof that conditions were met that allowed him to release the Escrow funds.

53.     No such proof has been provided.

54.     Rinde claimed the transaction had been "consummated" and the Escrow funds were now in the Middle East.

55.     Upon information and belief, the source of said information and belief being Tony Ciccarelli, a party familiar with the RASH defendants, at least part, if not all, of the Escrow funds were simply distributed between and amongst David Ault, Rick Siegel, and Jeffrey Rinde.

56.     Also on the January 16, 2020 phone call, Jim Hiller confronted Ault/Straightline regarding his misrepresentations made on the February 1, 2019 phone call, wherein he claimed to have had great success with the program for cannabis-related customers, and had closed such transactions.  *Supra*, ¶ 24.  When confronted with this, Ault/Straightline responded that "Well, we have pending transactions."  Ault admitted that they had not disbursed any loan proceeds to any other customers in the cannabis industry.

57.     DCH requested that the RASH Defendants provide references for any loan he has closed under the program, for any industry.  Ault responded that "we have provided references in the past."

58.     Ault/Straightline never provided references.

59.     On January 24, 2020 DCH issued a formal demand letter to Rinde, CKR, Ault, and Straightline for return of the Escrow funds.

60.     On February 12, 2020, Rinde/CKR responded "please confirm you want CKR to deliver instructions to the requisite parties directing release of $400,000 of Straightline's funds pursuant to its irrevocable instructions contained therein. On receipt of your confirmation we will promptly deliver such instructions."

61.     Putting aside for the moment that funds were not "Straightline's", and should have remained in Escrow, DCH responded on February 14, 2020 "I don't think my letter could

be more clear. We are requesting the immediate return the $400,000 deposit that was placed in escrow in your firm's trust account. We are further demanding that you send or cause Straightline to send this by certified check on or before February 28th, 2020. Otherwise, we will be taking legal action to collect this amount."

62.     No efforts have been made by the Defendants to return the Escrow funds.  The RASH Defendants continue to offer ever more inventive explanations as to why the money is not available; ranging from blaming the amorphous "Feds", to Citibank, to the Federal Reserve, to the Central Bank of the UAE, and even Jared Kushner.

<u>Culpable Persons</u>

63.     Each of the named Defendants are people or entities capable of holding a legal or beneficial interest in property.

<u>Enterprise</u>

64.     The named Defendants constitute an established enterprise-in-fact; the purpose of such enterprise being solely to unlawfully deprive prospective loan clients of significant sums of money, to the benefit of defendants.

<u>Interstate/Foreign Commerce</u>

65.     The Escrow fund wire on April 5, 2019, took place from two sources, one in Texas and one in Massachusetts, and were sent to a New York account.  Telephone calls and mailings in furtherance of the scheme have been made to and from Minnesota, Florida, New York, and other states. The alleged predicate acts have involved wire transfers from Pennsylvania, New York, Tennessee, Minnesota, Arizona, and elsewhere.  Rinde/CKR claimed to have wired DCH's Escrow funds overseas.

Pattern of Racketeering Activity

66.     The RASH Defendants have engaged in at least two acts of racketeering activity which occurred within the last ten (10) years; acts that have the same or similar purposes, results, participants, victims, methods of commission, or otherwise interrelated by distinguishing characteristics and are not isolated events.

67.     The scheme consists of related predicate acts, extending over a substantial period of time, since at least 2014 to the present.

68.     Further, given that the last presently-known victims were defrauded in September 2019 (Kevin Granger, Canada), and the RASH Defendants are continuing to advertise the loan program, there is a threat of continuing criminal conduct.

Predicate Acts

**Arizona: Steve O'Neill**

69.     On June 24, 2015, Ault/Straightline and Rinde/CKR entered into a substantially similar agreement to the instant matter with non-party L3gacy Growth Fund, LLC ("LGF").

70.     "LGF" sought a $9 million USD loan.  The RASH defendants required $350,000 to be placed in Escrow to secure the loan. Ault/Straightline provided assurances regarding their ability to secure the loan, and Rinde/CKR provided assurances that the Escrow would be held until the loan funds were secure.

71.     The $350,000 Escrow was provided by non-party Steve O'Neill (under false pretenses from LGF, which are not the subject of this action).  The funds were wired on July 2, 2015 from Arizona to CKR's account at Citibank in New York.

72.     The loan funds were never secured or disbursed; however, Rinde/CKR released the Escrow.

73.     On May 4, 2017, Steve O'Neill secured a judgment directing the return of the Escrow funds.

74.     To date, the Escrow funds have not been returned to Mr. O'Neill.  The matter is ongoing in the Superior Court of the State of Arizona, County of Maricopa, under Case No.: CV2016-016821.

**Minnesota: William Krake, Adam Cozine, Brian Farrell, Timothy Nichols, PropCo**

75.     In 2015, PropCo Capital Trust LLC ("PropCo") was seeking funding for a $129 million USD project to build a mall in Albertsville, Minnesota.

76.     On December 8, 2015, PropCo entered into an agreement with Ault/Straightline and Rinde/CKR to secure funding.

77.     The agreement required PropCo to contribute $4,680,000 to the escrow fund and purportedly required Straightline to contribute $5,616,000 to the escrow fund, purportedly to secure the $129 million USD loan.

78.     When PropCo could not come up with the money, Straightline/Ault later revised the agreement to allow PropCo to contribute only $150,000 to the escrow funds (with Straightline contributing the rest pursuant to a promissory note dated December 17, 2015), with an additional $250,000 to be paid directly to Straightline for administrative fees.

79.     PropCo borrowed the $150,000 to put into the escrow from Krake, Cozine, and Farrell.

80.     To date, the PropCo loan has never been disbursed.

81.     Ault/Straightline never put the nearly $10 million into escrow pursuant to the agreement.  Ault claimed at deposition that this was due to bank "compliance issues."

82.     Upon information and belief, the true purpose of the transaction was simply to extract $400,000 from PropCo, Krake, Cozine, and Farrell.

83.     The $400,000 has not been returned to the relevant parties.

84.     This transaction is currently the subject of a lawsuit pending in the State of Minnesota, Hennepin County, Court File No.: 27-CV-18-11206.

### Tennessee: Tricia Cunningham

85.     Tricia Cunningham sought a loan in an unknown amount from the RASH Defendants in 2015.  Ms. Cunningham placed an unknown amount in escrow consistent with the Defendants' scheme. Her loan has never been disbursed, nor have her escrow funds been returned.

### Illinois: Tony Ciccarelli

86.     Upon information and belief, Tony Ciccarelli sought financing through the RASH Defendants in or around March 2019.  Ciccarelli sought $10 million USD in loans and was required to put $400,000 in escrow to secure the loan.  The loan was never disbursed, and the escrow has not been returned.

### Illinois: Rick Silverstein

87.     Upon information and belief, Rick Silverstein sought financing through the RASH Defendants in or around October 2019.  Silverstein sought $10 million USD in loans and was required to put $400,000 in escrow to secure the loan.  The loan was never disbursed, and the escrow has not been returned.

### Illinois: Joseph Ori

88.     In or around June 2019, Joseph Ori sought financing through the RASH Defendants.  Unlike the other predicate acts, wherein loan seekers sought financing primarily through Hirsch/Euwana/Monster or Ault/Straightline (with Rinde/CKR as escrow agent), Ori met with Rinde at CKR's offices in New York, wherein Rinde himself pitched the loan program, and Rinde solicited Ori to put $400,000 in escrow.  Ori declined to participate in the loan

program – in addition to warning Rinde that Rinde was likely breaking the law by participating in the program.

### New York: Wayne DeMilia and MarWay Entertainment

89.     On July 24, 2014, Wayne DeMilia of Marway Entertainment provided the RASH Defendants with $75,000 to secure a loan in the amount of $6 million USD.  The loan was never disbursed and the $75,000 has not been returned.  This transaction is currently the subject of a pending lawsuit in the State of New York, County of Rockland, Index #: 34680/2019.

### Pennsylvania: John Lubimir

90.     Upon information and belief, John Lubimir sought financing through the RASH Defendants in or around March 2019.  Lubimir sought $14-15 million USD in loans and was required to put $600,000 in escrow to secure the loan.  The loan was never disbursed, and the escrow has not been returned.

### Canada: Kevin Granger

91.     Upon information and belief, Kevin Granger sought financing through the RASH Defendants in or around September 2019.  Granger sought $10 million USD in loans and was required to put $400,000 in escrow to secure the loan.  The loan was never disbursed, and the escrow has not been returned.

### INDIVIDUAL DEFENDANTS LIABLE

### JEFFREY RINDE

92.     Upon information and belief, Rinde has failed to abide corporate formalities in relation to CKR which are part and parcel of the corporate existence, including but not limited to production and retention of corporate minutes and records.

93.     Upon information and belief, CKR maintained, and continues to maintain, inadequate capitalization to be deemed a separate entity from Rinde.

15

94.     Upon information and belief, Rinde and CKR intermingled personal and business funds.

95.     Upon information and belief, Rinde exercised complete domination over the CKR entity, which functioned solely under the discretion of Rinde.

96.     Moreover, as set forth above, Rinde has utilized the corporate entity CKR to perpetrate fraud upon Plaintiff (and others).

<u>DAVID AULT</u>

97.     Upon information and belief, Ault has failed to abide corporate formalities in relation to Straightline and Ault Capital which are part and parcel of the corporate existence, including but not limited to production and retention of corporate minutes and records.

98.     Upon information and belief, Straightline and Ault Capital maintained, and continues to maintain, inadequate capitalization to be deemed a separate entity from Ault.

99.     Upon information and belief, Ault, Straightline, and Ault Capital intermingled personal and business funds.

100.    Upon information and belief, Ault, Straightline, and Ault Capital shared common addresses and phone numbers; to wit, the former Minnesota marital residence of Ault, is also the business address of Straightline; Ault's Florida home is the business address of Ault Capital.

101.    Upon information and belief, Ault exercised complete domination over the Straightline and Ault Capital entities, which functioned solely under the discretion of Ault.

102.    Moreover, as set forth above, Ault has utilized the corporate entities Straightline and Ault Capital to perpetrate fraud upon Plaintiff (and others).

<u>DONALD HIRSCH</u>

103.    Upon information and belief, Hirsch has failed to abide corporate formalities in relation to Euwana and Monster Capital which are part and parcel of the corporate existence, including but not limited to production and retention of corporate minutes and records.

104.    Upon information and belief, Euwana and Monster Capital maintained, and continues to maintain, inadequate capitalization to be deemed a separate entity from Hirsch.

105.    Upon information and belief, Hirsch, Euwana, and Monster Capital intermingled personal and business funds.

106.    Upon information and belief, Hirsch, Euwana, and Monster Capital shared common addresses and phone numbers; to wit, the business address of Euwana and Monster Capital is an empty storefront, which, upon information an belief, previously held a tanning salon business owned by Hirsch.

107.    Upon information and belief, Hirsch exercised complete domination over the Euwana and Monster Capital entities, which functioned solely under the discretion of Hirsch.

108.    Moreover, as set forth above, Hirsch has utilized the corporate entities Euwana and Monster Capital to perpetrate fraud upon Plaintiff (and others).

## **COUNT I**

### RICO § 1962(c)

109.    The allegations of paragraphs 1 through 107 are incorporated herein by reference.

110.    This Count is against all Defendants.

111.    The RASH Defendants and their affiliated corporate entities are an enterprise engaged in and whose activities affect interstate commerce. The RASH Defendants are employed by or associated with the enterprise.

112.    The RASH Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff as set forth above.

113.    The predicate acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

114.    The RASH Defendant(s) have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

115.    As a direct and proximate result of the Count I Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in their business and property in that: Plaintiff has been deprived of its ownership of $400,000, has lost business as a result of the fraud, and has incurred additional and substantial expenses associated with securing financing in order to stay in business.

## **COUNT II**

### RICO § 1962(d)

116.    The allegations of paragraphs 1 through 115 are incorporated herein by reference.

117.    This count is against all Defendants.

118.    As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).

119.    The Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(c), in violation of 18 U.S.C. §

1962(d). As direct and proximate result of the Count IV Defendant(s)' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in their business and property.

## COUNT III

### Breach of Contract

120.    The allegations contained in paragraphs 1 through 119 are repeated and re-alleged as if fully set forth herein.

121.    Defendants committed breach of contract by failing to perform under the Loan Agreement, Escrow Agreement, Refund Guarantee, and ancillary agreements.

122.    Plaintiff performed fully in accordance with the above agreements.

123.    Plaintiffs have or will incur additional, special, and consequential damages in relation to Defendants' failure to perform under the agreements.

124.    Defendants failed to provide the consideration for which Plaintiffs paid; specifically, Defendants have failed to provide the loan which was the subject of the above agreements.

125.    Plaintiffs are entitled to a refund of all moneys paid under the agreements, including the $400,000 believed to have been paid into Escrow.

126.    In addition, Plaintiff is entitled to judgment against Defendants for compensatory money damages, including investigation expenses, expert fees, and other fees related to Defendants' failure to disburse the loan or return the Escrow, and all other costs incurred in this litigation.

127.    Upon information and belief, that, as a direct and proximate result of the foregoing breach of the Contract, and the actions and/or omissions of Defendants, Plaintiff has sustained general, special, consequential and incidental damages in an amount presently

unknown, in that Plaintiff has incurred business losses as a result of Defendants' conduct. Plaintiffs will establish the precise amount of damages at trial, according to proof.

## COUNT IV

### Fraud: Fraudulent Inducement

128.    The allegations contained in paragraphs 1 through 126 are repeated and re-alleged as if fully set forth herein.

129.    In negotiating the Loan Agreement, David Ault represented to Plaintiff that he had successfully completed over 50 similar loans.

130.    In negotiating the Loan Agreement, David Ault represented to Plaintiff that the counterparty funding the loan was an international gas and oil company.

131.    In negotiating the Initial Contract, David Ault represented to Plaintiff that Rinde had never failed to secure the loan funds on any previous loan agreement.

132.    In negotiating the Loan Agreement, Rinde guaranteed that return of the escrow funds would occur if the loan transaction failed.

133.    All of these statements were patently false.  The RASH Defendants have never successfully funded a loan under the program.

134.    The representations made by Ault and Rinde as set forth above were patently false at the time they were made.

135.    The false representations made by Ault and Rinde to Plaintiffs set forth above were material to the loan agreement.

136.    Ault and Rinde had knowledge of the falsity of the representations at the time they made them.

137.    Ault and Rinde made these false material representations with the intent to induce Plaintiff into the loan agreement.

138.    Plaintiff justifiably relied on these statements.

139.    Plaintiffs suffered actual damages in an amount to be proven at trial, but not less than $400,000.

140.    Upon information and belief, that, as a direct and proximate result of the foregoing Fraud, and the actions and/or omissions of Defendants, Plaintiff has sustained general, special, consequential and incidental damages in an amount presently unknown. Plaintiff will establish the precise amount of damages at trial, according to proof.

141.    Defendants' actions were gross, wanton, willful, and morally culpable.

142.    Defendants' conduct towards Plaintiff is only one example of a scheme that is nationwide in scope and has caused millions in losses to numerous parties.

143.    Plaintiffs are entitled to punitive damages in an amount to be determined at trial.

## **COUNT V**

### Conspiracy

144.    The allegations contained in paragraphs 1 through 142 are repeated and re-alleged as if fully set forth herein.

145.    Plaintiff has properly pleaded the cognizable tort of Fraud as set forth above.

146.    The Defendants acted in concert and agreement with the purpose of defrauding Plaintiff.

147.    Each of the Defendants took overt action as set forth above.

148.    As such, all Defendants are jointly and severally liable for all damages resulting from the underlying tort, as set forth above.

## COUNT VI

### Unjust Enrichment

149.   The allegations contained in paragraphs 1 through 148 are repeated and re-alleged as if fully set forth herein.

150.   As a result of the conduct described above, the Defendants have been unjustly enriched in an amount to be proven at trial, to the detriment of Plaintiffs.

## COUNT VII

### Conversion

151.   The allegations contained in paragraphs 1 through 150 are repeated and re-alleged as if fully set forth herein.

152.   In perpetrating the scheme set forth above, Defendants, with intent to deprive Plaintiff of $400,00, did in fact interfere with and exercise dominion over the funds, including refusal to return the funds, in derogation of Plaintiff's ownership rights.

## COUNT VIII

### Breach of Fiduciary Duty

153.   The allegations contained in paragraphs 1 through 152 are repeated and re-alleged as if fully set forth herein.

154.   This count is against Rinde and CKR.

155.   In perpetrating the scheme as set forth above, Defendants Rinde and CKR purported to act as escrow agent in the subject transaction.

156.   It is well-settled that an escrow agent owes the parties to a transaction a fiduciary duty.

157.   Defendants Rinde and CKR failed to abide their fiduciary duty to Plaintiff, in that Defendants Rinde and CKR had actual knowledge of the fraudulent nature of the transaction and

that no prior transaction had been successful and failed to make such disclosures to Plaintiff, and also in that Rinde and CKR released the Escrow funds in violation of the escrow agreement.

158.    Upon information and belief, Rinde and CKR benefitted from releasing the Escrow without the conditions being satisfied and acted in bad faith.

**WHEREFORE**, Plaintiffs seek judgment as follows:

a) on Count I, for actual damages in an amount not less than $400,000; treble damages as permitted by statute, not less than $1,200,000; special, consequential and incidental damages to be established at trial, according to proof; and, legal costs and attorneys' fees incurred in bringing this action pursuant to statute;

b) on Count II, for actual damages in an amount not less than $400,000; treble damages as permitted by statute, not less than $1,200,000; special, consequential and incidental damages to be established at trial, according to proof; and, legal costs and attorneys' fees incurred in bringing this action pursuant to statute;

c) on Count III, for actual damages in an amount not less than $400,000; special, consequential and incidental damages to be established at trial, according to proof; and, legal costs and attorneys' fees incurred in bringing this action;

d) On Count IV, for actual damages in an amount not less than $400,000; special, consequential and incidental damages in an amount to be established at trial; and, punitive damages in an amount to be established at trial;

e) On Count V, for actual damages in an amount not less than $400,000; special, consequential and incidental damages in an amount to be established at trial; punitive damages in an amount to be established at trial; and, an order that Defendants are jointly and severally liable for all damages established;

f) on Count VI, for actual damages in an amount not less than $400,000;

g) on Count VII, for actual damages in an amount not less than $400,000;

h) on Count VII, for actual damages in an amount not less than $400,000; special, consequential and incidental damages to be established at trial, according to proof; and, legal costs and attorneys' fees incurred in bringing this action;

i) all together with interest, disbursements, costs, and such other, further and different relief that the court deems just and proper.

Dated:  Mineola, New York                    **JOHNSTON LAW LLC**
       April 8, 2020

By: _____
     **DANIEL A. JOHNSTON**
     *Attorney for Plaintiff*
     **DCH LICENSING L.L.C.**
     332 Willis Ave.
     Mineola, New York 11501
     SDNY Bar: DJ0235
     T: (516) 388-7611
     Dan@JohnstonLawNY.com